# EXHIBIT 1



# Transcript of Linda Allen-Bey

**Date:** February 11, 2026
**Case:** United States of America -v- Allen, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

---------------------------------x

UNITED STATES OF AMERICA           :

              PLAINTIFF,           :

   v.                              : Case No.:

                                   :            1:25-cv-118

LINDA A. ALLEN, IN HER INDIVIDUAL :

CAPACITY AND AS TRUSTEE OF THE     :

GOLDEN ASSETS SETTLEMENT TRUST;    :

BERRIEN COUNTY, MICHIGAN;          :

ST. JOSEPH CHARTER TOWNSHIP,       :

BERRIEN COUNTY, MICHIGAN,          :

                DEFENDANTS,        :

---------------------------------x

DEPOSITION OF LINDA ALLEN-BEY

Conducted virtually

Wednesday, February 11, 2026

10:01 a.m.

Job No.: 620177

Pages: 1 - 103

Recorded By: Erik Larson

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    2

Deposition of LINDA ALLEN-BEY, conducted virtually.

Pursuant to agreement, before Erik Larson, Notary Public in and for the State of Minnesota.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, UNITED STATES OF

AMERICA:

      DANIELLE E. SUMNER, ESQUIRE

      U.S. DEPARTMENT OF JUSTICE,

      CIVIL DIVISION  (TAX)

      P.O. Box 55,  Ben Franklin Station

      Washington, DC 20044

      (202) 353-0300


ON BEHALF OF THE DEFENDANTS, LINDA A. ALLEN, IN

HER INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE

GOLDEN ASSETS SETTLEMENT TRUST; BERRIEN COUNTY,

MICHIGAN; ST. JOSEPH CHARTER TOWNSHIP, BERRIEN

COUNTY, MICHIGAN:

      LINDA A. ALLEN-BEY, PRO SE

      1619 Lyola Court

      Benton Harbor, MI 49022

      (269) 861-1031

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                4

                    C O N T E N T S

EXAMINATION OF LINDA ALLEN-BEY                    PAGE

     By Ms. Sumner                                 7


                    E X H I B I T S

               (Attached to transcript)

DEPOSITION EXHIBIT                               PAGE

Exhibit 2   Response to Complaint                 32

Exhibit 3   First set of Interrogatories         24

Exhibit 4   Request for Documents                 26

Exhibit 5   Response to Interrogatories           27

Exhibit 7   Deed Transfer                         86

Exhibit 8   Petition to Enforce IRS Summons       94

Exhibit 9   Filing for Bankruptcy                 98

Exhibit 10  Complaint Against IRS                 95

P R O C E E D I N G S

THE REPORTER: I'm a notary authorized to administer oaths, and this deposition is being recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws, and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such. Hearing no objection, I'll now swear in the witness.

THE WITNESS: Danielle, I'm a witness against who? I thought I'm just a defendant. Who I'm a witness against and for?

MS. SUMNER: The -- that's just the kind of nomenclature in a deposition. Witness is the title given to whoever is being deposed. So in this situation, you are being deposed, so you're the witness. But you're right, you're the defendant in this action.

THE WITNESS: But I'm the witness against who? Myself? That's the question I have. I'm a witness against who?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                6

MS. SUMNER: You're a witness of the facts and events that are of interest in this case.

THE WITNESS: Because I'm -- I don't agree with the term witness. I don't.

MS. SUMNER: Would you be more comfortable --

THE WITNESS: (Crosstalk) who I'm going to get -- who I'm a witness to, and for who? I'm a witness from who? Myself?

MS. SUMNER: Yes.

THE WITNESS: I don't agree with the term witness because I don't consider myself a witness.

MS. SUMNER: I understand. Ms. Allen, as you're the defendant in this case, would you be comfortable if we used the term defendant?

THE WITNESS: Yeah, because -- yes. I'm -- I'm not no witness. I'm here to state the facts, and that's it. I'm not no witness.

THE REPORTER: All right, then. Then I will --

THE WITNESS: Sorry about that, Erik. Nothing --

THE REPORTER: No --

THE WITNESS: -- nothing against you, sweetheart? Just that I --

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    7

THE REPORTER: -- no --

THE WITNESS: -- I know what witness mean. And I see too much in court. Witness.

THE REPORTER: No problem. Then I shall swear in the defendant.

THE WITNESS: That's better.

THE REPORTER: Please raise your right hand. Do you solemnly swear or affirm, under the penalties of perjury, that the testimony you shall give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I affirm.

THE REPORTER: Thank you. You may proceed.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MS. SUMNER:

Q     Okay. Good morning, Ms. Allen. As you --

A     Good morning.

Q     -- know, because we've spoken several times previously, my name is Danielle Sumner, and I'm a trial attorney with the Department of Justice in the Civil Division, Tax Litigation branch. Ms. Allen, could you please introduce yourself as well, for the record.

A     Linda Allen-Bey, for the record.

Q     Thank you. And as you know already, I

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    8

represent the United States in the matter of United States versus Allen et al., Case Number 1:25-cv-118, in the Western District of Michigan.

          A     Yes.

          Q     And this deposition is being recorded by stenographic means with a court reporter, and it's happening virtually through Zoom video. So there's also a video recording being made. Ms. Allen, the court reporter just administered an oath to you, correct?

          A     Correct.

          Q     Okay. And taking such an oath requires you to tell the truth under penalty of perjury?

          A     Correct. Correct.

          Q     Thank you. Ms. Allen, do you have counsel representing you today?

          A     No.

          Q     We're on Zoom, and we're not in person. However, the oath and the -- the format of the deposition will be the same as if this deposition were happening in person. Ms. Allen, can you see and hear me clearly?

          A     Yes, I can see you. I can hear you, too.

          Q     Great. Do you understand that the oath you took has the same force as if you had taken the

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    9

oath in person?

     A     Yes, I do.

     Q     Can you ensure that you remain visible on camera during the deposition?

     A     Yes, unless I have to use the restroom. I'll let you know. But yes.

     Q     Yes, please. Please, if you need any breaks for bathroom or a snack or anything like that, just let me know, and we can take a break. And -- and we'll say, oh, ten minutes to -- to go and then come back, or anything like that.

     A     Okay.

     Q     Ms. Allen, do you have any other devices open aside from your computer?

     A     No.

     Q     Okay. Please ensure that you do not use any other devices during this deposition. Can you do that?

     A     Yes.

     Q     Is there anyone else in the room with you right now?

     A     Just me.

     Q     Do you understand that you cannot communicate with other people during this deposition?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    10

A    Yes. There's no one here, so --

Q    And you cannot communicate them -- communicate with them via text or phone call or other (indiscernible) device. You understand?

A    Yes, I do.

Q    Thank you. Do you understand that you cannot look up answers on the Internet or use any computer programs or applications during this deposition?

A    Look up answers for what? To what?

Q    Yeah, I -- I -- I'll just be asking you questions --

A    Okay.

Q    -- about your understanding of the issues.

A    Okay.

Q    So I -- yeah. But it's just the -- the -- the deposition requires that you not --

A    Okay.

Q    -- you know, look things up outside of the deposition.

Okay. Ms. Allen, are you able to access the chat that's part of this Zoom window?

A    I see a chat at the bottom. I can just click on that if I have to?

Q    Okay. Great. Thank you. I will be sharing document exhibits. I'll drop them into the chat. And they'll be in PDF format, so you can just download them from the chat as I put them in there. Does that sound --

A    I just click on chat and download a document?

Q    Yes.

A    It'll let me download once I click on it?

Q    Yeah.

A    Okay.

Q    Please do not open any individual document that I put in the chat until I ask you to do so. Can you do that?

A    Yes, I can do that.

Q    Thank you. I would like to state for the record as well that earlier this morning, about an hour ago, we had a technology check to ensure that we could all access the Zoom link and hear and see each other.

Ms. Allen, we had previous phone conversations about scheduling this deposition last week, right?

A    Correct.

Q    I initially proposed having the

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    12

deposition in person at the U.S. Attorney's Office in Grand Rapids, but that would have been a difficult --

A    Yes.

Q    -- commute for you?

A    Yes. Correct.

Q    Therefore, we agreed to -- to do a virtual deposition instead?

A    Correct. Yes. Correct.

Q    Okay. Ms. Allen, have you ever had your deposition taken before?

A    I never -- this is my first time ever doing a -- a deposition.

Q    I will explain the -- just the format of the deposition. And if you have any questions about that, please let me know, and I can answer them. But the general gist of how this works is: I will ask you questions about the events giving rise to this case, and you will answer them truthfully and to the -- the best of your knowledge. If I ask you a question that you do not understand, please say so, and I will clarify.

A    Okay.

Q    I'll try and reword the question, if needed, or repeat it. But I want to make sure we're

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    13

on the same page --

A    Okay.

Q    -- before you answer.

A    Okay.

Q    For the sake of the court reporter, I will try to be sure to wait until you finish answering a question before I ask you another question, and I would also ask that you wait until I finish asking a question before you start answering. And that way we will not talk over each other. And that makes it easier for the court reporter, and it makes for a clearer transcript as well. Can you do that?

A    Yes.

Q    Thank you. When you answer my questions, please do so verbally with a yes or a no. Things like shaking your head or hand gestures will not show up on the transcript, but your words will. Do -- do you understand?

A    I understand.

Q    And as we already talked about, if you need a break, please let me know, and  -- and we'll take a break. If at any time you realize that a response that you previously gave is incomplete or inaccurate, just let me know, and I'll -- I'll make

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    14

sure to give you the opportunity to correct your answer.

A    Okay.

Q    Are there any health-related or medical reasons that would prevent you from answering questions truthfully today?

A    Not to my knowledge, no.

Q    Ms. Allen, after the court reporter completes a transcript of this deposition, he'll provide you with a copy of the transcript. And then you'll have 30 days from the date that you receive the transcripts to review it and correct any errors on a document called an Errata Sheet. Would you like to take the opportunity to -- to review the transcripts once it's been produced and --

A    Yes, I do.

Q    Okay. And if you do not change anything on the transcripts within 30 days, that will be interpreted as -- as your acceptance that what is on the transcripts is accurate. Do you understand?

A    Understood.

Q    Okay. Ms. Allen, that's the kind of basics of how this will work. Do you have any questions or concerns before we move to --

A    I'm -- I'm ready to get it started and

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    15

get it done.

Q    Great. So, Ms. Allen, I'd first like to ask some questions about how -- how you prepared for today's deposition.

A    I didn't. I didn't. I'm just ready, here for it.

Q    Okay. So did you do anything in particular to prepare for today's deposition?

A    No.

Q    You didn't speak to anyone about this deposition?

A    No.

Q    Did -- did you tell anyone that you had this deposition?

A    I told my sons, in case they try to call, and I won't be available.

Q    How many sons do you have?

A    Three. They grown, though. So --

Q    Did you say anything else to them about the deposition?

A    They don't know nothing about a deposition, like I don't know. So all they know I was having someone with the IRS tax unit. That's all they know.

Q    Did you consult with any attorneys about

today's deposition?

A    No.

Q    Have you consulted with any attorneys about this case?

A    No. I have a -- no.

Q    Did you review any documents in preparation for today's deposition?

A    I went over the -- the last thing that I sent you, that was the -- my response to your interrogatories, I think.

Q    Yes.

A    That's the only thing I reviewed. And I answered that.

Q    Thank you, Ms. Allen. I -- I have a copy of those as well, and -- and we will discuss those later.

A    Okay.

Q    Did you speak with anyone aside from your three sons about this deposition?

A    No.

Q    Ms. Allen, I'll shift to asking you some questions just about your background.

A    Okay.

Q    What is your current address?

A    1619 Lyola Court, Benton Harbor, Michigan

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    17

49022.

Q    And how long have you been living in --
at 1619 Lyola Court?

A    Since December 2014.

Q    Why did you move to that address?

A    Why did I move to it? Because it was a --
it was available, and I liked it, the home.

Q    What do you mean by available?

A    It was -- it was -- it was available to
move in. That's why I moved here. Because I was
staying with a cousin of mine. Then this -- I seen
this house was available, so --

Q    Was it for sale?

A    Yes.

Q    Do you currently reside at any other
addresses aside from 1619 --

A    No.

Q    Do you live alone at 1619 Lyola --

A    Yes.

Q    And where did you live before you lived
at 1619 Lyola Court? I know you just said you lived
with your cousin.

A    On Bishop. 1321 Bishop. I believe 1321
Bishop, Benton Harbor. That's Benton Harbor as
well.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    18

Q    And how long had you lived at that address?

A    From 2012 to 2014.

Q    Prior to 2012, where were you living?

A    On 112 Searles. That's in Benton Harbor as well.

Q    Have you lived in Benton Harbor your whole life?

A    Yes.

Q    How old are you, Ms. Allen?

A    59.

Q    Do you have any family aside from your three sons?

A    I have a sister and two brothers that's living. Grandchildren. My -- my -- my dad. My mom is no longer living. My father and stepfather.

Q    Do your -- do all three of your sons live in Michigan?

A    No, just one. One of -- my oldest son is incarcerated, but I have one in Michigan. And the other one lives in Virginia.

Q    Does your sister live in Michigan?

A    Yeah, she lives in Michigan.

Q    Does she live in Benton Harbor?

A    Sodus.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                19

Q    And your son who lives in Michigan, is he in Benton Harbor?

A    No, he's in Grand Rapids.

Q    Is your father in Michigan?

A    No, he's in Illinois.

Q    And where do your -- your grandchildren live?

A    I have one -- four lives in -- five lives in Grand Rapids. One lives in Minnesota. One lives in -- two lives in Virginia. Two lives in Indiana. I have 11 grandchildren, so --

Q    That's quite a few.

A    Sorry. But, yes, 11 grandchildren. Nobody lives here, though. Oh, I have one live in Ohio. One live in Ohio.

Q    Ms. Allen, did you attend high school in Benton Harbor?

A    Yes, I did. Graduated in 1984.

Q    And what did you do after high school?

A    Nothing. I was pregnant twice in high school, so -- I did do some college, but I never got a degree.

Q    What college did you attend?

A    LMC, Lake Michigan College. And I did Jordan College when they first opened. And I don't

think Jordan College even around anymore. That's when I first graduated high school, I tried to do Jordan College.

Q   Did you start working after high school?

A   I had some -- some work at the high school, but it was really hard because I had two -- two -- two babies. So it was just, you know, a little odds and end. I think I worked at -- at a deli my senior year, after I graduated. But then after that, I think, once my kids got a little older, I stopped working.

Q   What was the first job that you had out of high school?

A   Deli on the Wall. It was called Deli on the Wall. Just work behind a deli.

Q   And when did you start working there?

A   I started in 80 -- I started while I was in high school, in '84, I believe. And I -- and I continued to -- after I had my second child. So after that, no, I didn't work after that. I think it was a while before I worked after that. I had, like, summer jobs and stuff like that, that you can get for the summer.

Q   And what job did you have after Deli on the Wall?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    21

A      Oh, dang, that was so long ago, I -- I can't remember. I know I did some summer jobs. Because I was still a teenager, I was able to get a summer job. I remember working for -- being a bus monitor when my kids was little. So, I don't know. I have to get that from Social Security office, I guess, what I did. They should have a record of that.

Q      What was the -- are -- are you currently working?

A      No.

Q      What was the last job that you held before you stopped working?

A      Bosch. It was a factory called Robert Bosch. Just Bosch. They call it Bosch, though.

Q      And what was your job --

A      Machine operator. I was a machine operator.

Q      How long were you at Bosch for?

A      Three years, I think. Three years. I started in September 2021. Three years. Basically, 3 to 4 years. No -- no more than four years. Not even quite four.

Q      What were you doing for work before you worked at Bosch?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    22

A    I was -- I was -- I had -- pandemic came -- I was working at a factory called Kays [sic] Manufacturing, then the pandemic came, so -- and I lost my job due to the pandemic.

Q    How long were you working at Kay?

A    I started in 2016 to 2020. So that's four years.

Q    And what was your role at Kay?

A    Same thing, machine operator.

Q    And before you were at Kay, what was that job?

A    I worked at AUSCO. And that was a -- a factory as well, same thing. Always been a machine operator.

Q    And what was the employer's name?

A    AUSCO. AUSCO.

Q    And how long -- when were you at AUSCO?

A    2010, I believe. I think 2010, '11. And I left there, and that's how I wound up at Kay. So I think from 2010 or '11 to 2016.

Q    Since 2011, did you ever have any other jobs aside from working as a machine operator?

A    Since I worked at 2000 -- since I worked at Kay, did I have another job at Kay?

Q    Since you worked at AUSCO, around 2011.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                23

A     No.

Q     Ms. Allen, have -- you introduced yourself for the record as -- as Linda Allen. Have you ever gone by any other names?

A     I was married before. It was Andrews.

Q     And so you went by Linda Andrews?

A     Yes. That was my married name.

Q     Have you ever gone by -- oh, sorry.

A     I said I was -- I had got married in '98 -- 1999, and I divorced in 2005. I went back to my -- back to Allen.

Q     Did -- have you gone by any other names aside from Allen or Andrews?

A     Allen-Bey. And that -- that's it.

Q     And what's the origin of -- of Bey?

A     It was a free national name when I joined that group. It was a free national name. That's when I was telling you, some people change they name. I kept my my -- my -- birth-given name that my mom gave me, Linda.

Q     Did you ever go by the title Minister?

A     That was part of that group. That's a title that we was given when I was in that group.

Q     Ms. Allen, I'll ask you some follow-up questions about that group in a minute, but first,

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                24

I'd like to discuss the discovery requests that you received from the United States. Do you recall receiving the discovery requests from the United States?

A    I -- I recall receiving something from you. That's the one that had the exhibits and all that in it?

Q    Yes. You received those -- those interrogatories and requests for production in --

A    Yeah.

Q    -- in early December. Is that correct?

A    Early December, January. It's one of them, Danielle.

Q    Okay. One second, and I will drop an exhibit into the chat for you. Okay. Ms. Allen, I just dropped the first exhibit into the chat.

(Exhibit 3 was marked.)

A    You need me to click on it?

Q    Yes. You should be able to click on it now.

A    That Exhibit 3?

Q    Yes. Labeled as Exhibit 3 -- as Government Exhibit 3.

A    Okay. I have it.

Q    And, Ms. Allen, you can take as much time

as you need to review the document. And once you've reviewed it, please let me know if you recognize this document.

A    I recognize it.

Q    What is this document?

A    It says, the Plaintiff United States First Set of Interrogatories to Defendant Linda A. Allen.

Q    Are these the interrogatories that you received in -- in or around early December?

A    Around December or January when I received it. Somewhere in there. I do remember receiving this.

Q    Okay. I have one more.

A    Did you need me to minimize this? Because I -- I can't see nobody anymore. Do I minimize this?

Q    Yeah. Or you can -- yeah. And I'll let you know to --

A    Okay.

Q    -- if and when you need to pull it back up.

A    Okay. Exhibit B, you want me to pull that one up?

Q    Yes. This one is Government Exhibit 4.

(Exhibit 4 was marked.)

THE REPORTER: I'm sorry to interrupt, but you would like these marked and attached -- marked for this exhibit just as they are?

MS. SUMNER: Yeah, please. Exhibit 4.

THE REPORTER: All right.

MS. SUMNER: I -- I may get to exhibit -- Exhibits 1 and 2 as well later.

THE REPORTER: Thank you.

MS. SUMNER: Thank you.

BY MS. SUMNER:

Q    Ms. Allen, do you recognize Government Exhibit 4?

A    Yes. I -- I remember this document. I think -- the date, when you say I was supposed to responded on the 5th, I thought everything was changed. We changed the date, right?

Q    We did, yes. We agreed to that.

A    On the phone, yes.

Q    (Crosstalk.)

A    I remember that, yes.

Q    But these are the -- the requests for production that you received from the United States? Once you had a minute to review them.

A    I looked at it already.

Q   Okay. And those were the requests that you received from the United States?

A   It -- it looks like the same. I don't have the ones that -- that you sent me through the mail, but it looks like the same.

Q   Okay. And, Ms. Allen, I have one more exhibit for you before I start --

A   Okay.

Q   -- discussing them more. Were you able to -- to download Government Exhibit 5?

(Exhibit 5 was marked.)

A   Let me see. It's downloading now. It's mines. Yes, I remember this.

Q   Okay. Are these the interrogatory responses that you sent to the United States --

A   That I -- that I sent. Yes, this it. Correct.

Q   Ms. Allen, did you send any documents to the United States in response to --

A   No. No, I didn't.

Q   Why not?

A   Me and you spoke about that over the phone. I said I didn't have any documents. The ones I did have was wet -- got wet in the basement couple years ago, and they got threw out. I kept it

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    28

in a box.

Q     Do you remember when that happened?

A     Few years ago.

Q     When you say a few years ago, is that one year ago --

A     Yeah, yeah. I haven't -- because I -- I kept all that stuff in a box in the basement, Danielle, that's no use to me anymore. That's how the situation happened, and the basement gets wet. It floods a lot sometimes. And it was in a box.

Q     And -- and so the -- your basement flooded several years ago?

A     No, it floats all the time. It does when it rains. Especially when it rains. Not to the point that's to your -- your knees or nothing like that, but it gets wet down -- it gets wet.

Q     So it -- it rained heavily, and your basement flooded?

A     Well, if it rain hard, it will. The -- the basement -- the floor gets wet if it rain hard.

Q     So how many years ago were the documents destroyed?

A     A few years ago. What -- I can't tell you. What, '18? '19? I don't know. I -- I just know when I -- I threw that mess away because it's --

the basement was smelly and everything, with the --
because it got carpet down there, too.

Q     What -- did the flooding cause any other
damage to your basement or your house --

A     It just get wet. It just get wet. No --
no damage, really. A little mold or something like
that, but it just get wet. Well, you could smell
it. So, like, you know, musty basement smell. You
probably not familiar with that.

Q     Oh.

A     With a musty basement smell.

Q     We had a musty basement when I was --

A     So --

Q     I -- did you do anything to -- to repair
the basement once it was flooded?

A     No. It -- it don't do it every time.
Depends on how hard it rains. So --

Q     If the --

A     With moles -- you know the molds that dig
in the ground. I was told sometime they can mess
the -- you know, moles? You probably don't know
what I'm talking about. They probably ain't even
called moles. That -- you know about the dig in
your ground, in your yard. Those called moles, I
think.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    30

Q    The -- the animal?

A    Yes. Moles that dig in your yard -- dig holes in your yard. I was told that that could be why when it rain like that. Because when they dig in your yard, they say they can mess with your -- down to the foundation or something. I don't know, Danielle. I don't know. That's what somebody was just telling me.

Q    So you estimate that the documents were destroyed when your basement flooded?

A    And that's stuff that I had when I was in the group, paper -- you know, documents that I was in a group that we have, the papers and stuff like that.

Q    And you say this flooding happened, and the documents were destroyed around 2018 or 2019?

A    It was -- it got wet in a box. And you know when they get wet, some of the ink done faded off of it and stuff like that. So I -- it was no use to me anyway, so I -- I throw it -- I threw it away. That and the other stuff that got wet.

Q    You said your basement floods pretty frequently? Had it --

A    When it rain hard, the floor gets wet.

Q    Had it flooded prior to 2018?

A     Yeah, when it rain hard. We have a lot of rain. Well, maybe flood not the word I should use. It gets wet down there. The floor gets wet.

Q     Is there any other location in your house where you keep documents?

A     No. Not -- not -- not that stuff. That ISIS stuff, no.

Q     Is there any location outside of your house where you keep documents?

A     No.

Q     Do you have any documents stored electronically? And I can clarify that. I mean on, like, a online storage, such as --

A     No.

Q     -- cloud? Dropbox?

A     I don't even know how to use cloud. No.

Q     Had you ever emailed any of those documents to anyone?

A     No.

Q     Okay. Ms. Allen, I'm going to turn now to the -- the Indigenous Society Group that --

A     Okay.

Q     -- you referred to earlier and ask you some questions about that. But first, let me give you Government Exhibit 2. I'll drop it right now in

the chat.

(Exhibit 2 was marked.)

A    Okay.

Q    And let me know once you've had a minute to look over the document.

A    I got it.

Q    Ms. Allen, do you recognize this document?

A    Yes, I do.

Q    What is it?

A    This is my response to the -- the summons I first received from you, I believe.

Q    Yes. And in -- on the second page --

A    Oh, wait a minute. Let me back off of it.

Q    -- of your answer, you state -- maybe the -- the third sentence into that paragraph, you say, at 10:41, Tax was filed on the behalf of the trust.

A    Yes. I see that.

Q    And you met this person in -- in the International Indigenous Society Group?

A    Yes.

Q    What is the International Indigenous Society Group that you're referencing there?

A    The group that I was in.

Q    Is that --

A     (Indiscernible) -- huh?

Q     Is that the formal name of the group?

A     It was called -- yep. It was called I -- It was ISIS, what it was called. But when that group -- that -- that group came out, ISIS, years ago, they changed the name. And I wasn't in the group then when they did that. But it was International Indigenous Society Group. That's what ISIS stood for.

Q     And then they -- they changed the name?

A     Yes, they did. I was no longer doing -- dealing with them anymore after that. I was told the name had changed.

Q     And when -- when did the group change its name?

A     I don't know, Danielle. I can't remember when they did it. I don't know when they did it. I didn't know it was changed till somebody had told me they changed the name.

Q     You said it was changed after you left the group?

A     Yes.

Q     When did you leave the group?

A     When I got -- found out about the tax return and stuff like that wasn't legit. And I

think I found that out in 2016, I believe -- '15,
'16, I believe. It's between, I think, '16, though.
Could've been '15. I don't know. Between those two.

Q    So you're estimating you left the group
sometime between 2015 and 2016?

A    Somewhere -- when I first found out about
the -- the -- the -- the check and stuff like that.
They said it was -- those -- it was fraudulent.

Q    Yeah. Thank you. I -- I'll follow up on
that in -- in a minute. So who -- who's in the --
the -- I'll just refer to it as the Indigenous
Society --

A    Okay.

Q    -- moving forward. And -- and you'll know
what I'm referring to when I say that?

A    Okay.

Q    Who -- all right. Strike that.

When did you join the Indigenous Society?

A    I believe it was 2010, I believe.

Q    And how did you learn of the Indigenous
Society?

A    Social media.

Q    What social media?

A    Different stuff I was listening to, they
was teaching people of our nationality that -- who

we -- to learn who we are and the names that we know -- teach us about ourself, and -- and we all didn't come from Africa. And I got interested in what they were saying. I read it, and it had a group that you can join in to learn more about us and our -- and our descendants.

Q    And (crosstalk) --

A    That's how I came -- I had been across social media because nobody around here deal with stuff like that. So it had to been on social media I seen it.

Q    And what social media platforms, specifically?

A    I want to say it was Facebook. I want to say it was Facebook, but don't quote me on that. That was so long ago.

Q    If it wasn't Facebook --

A    And I went online -- I believe it was Facebook. And I went online and did more information about it, teaching us about who we are and our stuff and where we all came from.

Q    Were you using any other social media platforms at that time?

A    It had to been just Facebook. It had to been. Then going online, Googling and stuff like

that on the Internet. But I first came across it on social media.

Q    And once you saw information about the group on social media, what did you do next?

A    I did more research what they was teaching us about ourselves and who we were.

Q    And what research did you do?

A    To find out did we all come from Africa. And -- and the last names that we had, they say they was slavemaster names. So it wasn't our birth-given names. And it wasn't our language. It's teaching me about my -- our background of who we are and where we come from. Indigenous. They said we was indigenous. We -- we were already here. We wasn't brought over here on a slave ship like we've been told and taught in school. Just teaching us about ourself and teaching us that we're not black. We're not. They was just teaching us who we are. We not African American. Just teaching us who we are.

And that's something that anybody, you know, of my color or nationality would be interested in, in knowing who we are. Said what we was told in school, we was told we was -- that we was told in school wasn't true. That we all wasn't African, that we all didn't come from Africa. Our

descendants did not come from Africa, and we were already here.

Q    I -- the additional research that you did into this group once you saw information about it on Facebook, did you do that additional research online?

A    Online.

Q    Did you do any research by talking to people?

A    When I was in the group. People around here is not -- wasn't used to that where I live at, Danielle. You know, it's more pity now than it was back then, you know, because it's -- it's out there. The information is out there, you know, different people talking about it and stuff like that, who we are and stuff like that.

Q    But the -- was there a website online that you -- that you viewed, or -- or several websites?

A    Different websites. And I can't tell you. I just put in, you know, who we are and where we come from and stuff like that, you know.

Q    Does the Indigenous Society have a website?

A    I don't think they'll have one now,

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    38

Indigenous Society, because it's not called that anymore. If they do, I'm not aware of it. You can try and put it in there yourself and see what you come about it, International Indigenous Society.

Q    And you touched upon this earlier, but could you explain the ideology and the beliefs of -- of the Indigenous Society?

A    That we all wasn't slaves, and we were already here, and our -- and -- and our nationality is not black or African American. And I know it don't state that on my birth certificate. They said look at your birth certificate. And it had Negro on my birth certificate. And they doing this -- giving false information from the door.

Q    When you said --

A    And that's --

Q    -- we were already here, is here --

A    Well, I mean already here on land already, not we didn't come -- we all wasn't -- we wasn't -- we didn't come from Africa. Everybody did not come from Africa when we -- like we was taught in school. That we were all slaves. Our ancestors were all slaves. How we got here in America, when I -- what I mean by here, I mean America.

Q    North America?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                     39

A    No, I don't -- just America. We were all over based on the research and studies that -- we was all over. We -- we didn't come from African -- Africa.

Q    Ms. Allen, if you could allow me to -- to finish asking the questions, just for the clarity --

A    Oh, okay.

Q    -- of the transcripts.

A    Okay. Did you need me to minimize this document or keep it up? Because I can't see you when I pull -- have this document up.

Q    Yeah, you can minimize it for now, and I'll --

A    Okay.

Q    We'll come back to it later, but --

A    Okay.

Q    I -- Ms. Allen, how many people were in the Indigenous Society when you joined --

A    Yeah, it was a -- it was a lot of people. I don't know. They was from all over. All over different states.

Q    How many different states?

A    I don't know. I didn't know everybody was in the group. I didn't know everybody, but I know

it was several states. It just wasn't one state. Several states: North Carolina. South Carolina. You had a few in Michigan area. Chicago, Illinois. Virginia. Everywhere. They was from everywhere.

Q    If you had to estimate how many people were in the group in 2010 when you joined, how many would you estimate?

A    I didn't know everybody. So I don't know. Hundreds. Could be thousands.

Q    Would you say more than 5,000?

A    I say I don't know, because I didn't know everybody. But I know it -- it was a lot of people in the group that I have never met or seen before.

Q    You'd say more than 500?

A    I can say more than 500. They are from different states. So --

Q    Did you ever meet with any of these individuals in person?

A    Sometimes they had meetings in Illinois, in some building in Illinois. I can't tell you the name of the building. But, you know, they had meetings and stuff, like, steady teaching us who we are and stuff like that. They have meetings and stuff like that.

Q    Did you ever attend any of those meetings

in Illinois?

A    I went to one. And I can't tell you when. That was years ago.

Q    Would you say the meeting happened between 2010 and 2014?

A    I went to one meeting between there. It was one up in there somewhere.

Q    Was the meeting in Chicago, Illinois?

A    Yes. It was in Chicago somewhere.

Q    Do you remember how many -- strike that.

How many people were at that meeting?

A    It was a lot of people there, Danielle. A lot. Could've been -- I can say hundreds. Could've been a lot. Hundreds of people was there.

Q    Where did the meeting happen?

A    Somewhere -- some building in Chicago. Some tech building. That's all I can tell you. I wasn't familiar because that was my first time, you know, going.

Q    How long was the meeting?

A    A few hours. Basically giving us education on our background and who we are.

Q    Were there teacher --

A    No.

Q    -- or (crosstalk)?

A    It -- it was a group -- a guy that was in a group that was conduct [sic] the meeting. No teachers.

Q    Did he have a -- a title within the Indigenous Society?

A    Brother -- all I called him was Brother Jabari. Now, you know, that ain't nobody real name, Jabari. I don't know what his real birth-given name was. We always address each other as sister or brother in the meeting. You know, well, brother. Sister. All I know is Brother Jabari, he the one was conduct the meeting and teaching us different stuff.

Q    What did he teach at the meeting?

A    Different stuff about who we are and what was -- where we come from and what we invented as a whole, not we -- me. But just teaching us about us and back -- giving us background about us and who we are. They -- like, we indigenous. That mean native to the land. Teaching us stuff like that. They looking at it as a senior citizen -- they look at it as a sovereign group as labeled as a bad group. I noticed that. And -- but a sovereign citizen group, what they know -- what they got to know, and that's something bad that they look at it

as. You know, people that's outside the group as a bad -- like, a sovereign citizen. I'm pretty sure you're familiar with that word.

Q    Could you clarify what you mean? You're saying the Indigenous Society is a group of sovereign citizens?

A    No. That's how they -- that -- that's how we was labeled, as sovereign citizens. And -- and it wasn't in a good way how they labeled it. And sovereign citizens, you know, like dealing with the courts and stuff, they -- like, the -- that's the sovereign citizen movement group or something like that.

Q    When you say --

A    So we are sovereign. Huh?

Q    When you say they labeled the group --

A    I'm talking about, like, courts and stuff like that. Because I had, like -- I went to court with Janet T. Neff, as I spoke before, and it wasn't nothing good that came out of that group. They had bad -- you know, it's called sovereign citizens. That's nothing good to the eyesights of the courts.

Q    What is your understanding of the term sovereign citizen?

A    I thought sovereign because they said we -- my understanding basically, Danielle, when I was -- when I was off into that group and stuff like that, how we was given false information and who we really are and stuff that was taken from -- land was taken from us and stuff like that. We was -- we was here already. Aboriginal, meaning we -- we was first and sovereign -- native to the land. This is our land, and we was told that it's not. It was teaching us that we was taught wrong by white people. I'm being honest.

Q    Do you still believe those teachings?

A    Not a lot of it, but I know we -- I believe that we all didn't come over here on no slave ship. I don't -- I believe -- I don't believe that, that we all was slaves and we came over here on the boat, how we got to America. And how Christopher Columbus did not discover America. It's all out there now on the Internet. You can see that. They say he never got off the boat. So how he discover America? They label it as a hate group. That's how I want to say, and a hate group. And it was -- they was teaching us who we were. You know, that's my understanding who we were when I -- when I first joined the group. Because I would like to

know where -- who we were, who we came from, who my great-great grandparents was and where they came from.

Q    Ms. Allen --

A    So they said -- you know, we was always told white people been doing it all along, you know. They know who they are. We the ones don't know who we are. Because nationality don't change. Your -- nationalities don't change. We were taught that. Ours changed a lot. We went from color, Negro, Afro, African. And they said nationalities don't change. And it don't, Danielle, it don't. It just teaching us who we were. That's basically what the group was about, to my understanding.

Q    Ms. Allen, aside from that one meeting that you attended in person in Chicago, did you attend any other meetings with the International --

A    No.

Q    Indigenous Society --

A    No. No.

Q    -- in person?

A    No. No.

Q    Did you attend any meetings online?

A    No. I disassociated myself for everything. Nothing. No.

Q    When you were a member of the Indigenous Society, was the meeting in Chicago the only meeting that you ever --

A    They had them everywhere. That was the closest to me. They had them everywhere.

Q    Was that meeting in Chicago the only meeting that you ever attended?

A    No. I went to, yes.

Q    How did the Indigenous Society communicate with its members?

A    We had -- we had -- they had a -- a -- leaders who get, you know, different states who they handle what state and this and that. Like I said, Brother Jabari was close to us -- to me and, you know, us in Michigan. And I don't know who they had up Detroit way. Different states -- they had someone assigned to different states and area. And I know Brother Jabari was close to me.

Q    So every state has its own leader and --

A    We -- we had one chief, and that was Dr. Muhammad Ali. I don't know his real birth-given name. He was the chief. He was located in Washington.

Q    When you say chief, did that mean he was the leader of the entire --

A      Yes. He was the chief.

Q      -- Indigenous Society?

A      Yes.

Q      So the structure is: There's a chief, and then there are state leaders, and then there are members?

A      Yes.

Q      Are there any other kind of tier of -- of leaders? Or --

A      What did you mean by that?

Q      Let me rephrase. Can you only be either a member or a state leader or the chief? Are those the only three positions in the group?

A      Well, it was masters. That's like the master, the -- the documentation to teach us. You know, you had to be a master to teach us. I guess that's what Brother Jabari was. You know, the ones who master. It was called master -- I can't remember, Danielle. It was called master-something at that time. I couldn't remember. But I know Dr. Muhammad Ali was the chief. I don't know his real name. We always known Brother Muhammad Ali.

Q      How -- how do you become a member of the Indigenous Society?

A      Well, I got -- I went online. I think I

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    48

joined online. Groups online, you can join then. I don't know how they do it now, but that's how it was then.

Q    When you joined, did you have to submit an application?

A    Did I do an application? I don't know. I can't remember. I'm pretty sure -- I'm pretty sure I did, but I don't remember. I'm pretty sure. And when you join something, you got to -- you got to submit something, you know. But I can't remember that far back what I -- what I sign, what I did.

Q    Was there an interview process?

A    No.

Q    How did you know that you had been accepted as a member?

A    Online. We had our group thing online. When you fill it out, that's when you get your documents and stuff to get your free national name and all of that. Because we was taught --

Q    When you say that's when you get your documents, what -- what documents are those?

A    To -- you know, to -- to come from under the slave master last name. But I kept my Allen, respect to my father and my parents, and I just put hyphen Bey.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                     49

Q    So what documents do you receive when you become a member of the group?

A    That the name change. Name change document.

Q    Did you choose your new name?

A    You choose your own. They -- they -- they gave us a list of names we can choose from, and I -- I chose Bey. And it -- it all stood for something. I can't remember what Bey was, but it was something that I liked it, Bey. But you know, you had a list you could choose from free national last names. Even free national first names, for those who want to change their whole name, you can choose your own name.

Q    Who sent you the --

A    My chief, Muhammad Ali.

Q    Okay. And that's the chief of the entire organization?

A    Yes.

Q    You said he lives in Washington. Is that Washington, DC?

A    I believe he was living in Washington, DC at that time.

Q    Do you recall any other information about you said, Brother Muhammad?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    50

A       Doctor -- it was Dr. Muhammad Ali.

Q       Was being the chief of this organization his full-time job?

A       I don't know. I have no idea.

Q       Aside from when he sent you your name change documents, did you ever communicate with Brother Muhammad Ali?

A       We never talked to the chief. We always went through the people that was under him. That was Brother Jabari for us.

Q       How frequently did you communicate with Brother Jabari?

A       Not that often. You know, when I went to the meeting, if I had any questions after that. Not that often.

Q       How did you communicate with him in person?

A       When I went to the meeting. That's the only time.

Q       Did you communicate with him over the phone?

A       Did I ever talk to him over the phone before? If I did, it was some questions about what we -- we learned over there. But other than that, on a basis -- regular basis, no.

Q    Did you ever text with him?

A    No. Not to my --

Q    Did you ever --

A    -- knowledge, that I remember, no.

Q    Did you ever email with him?

A    Based to my knowledge, no. Because he passed out everything at the meetings that we need, different documents that we -- that he was teaching about, and you could ask questions then at the meeting.

Q    You said previously that Brother Jabari was based in Illinois?

A    Last I known, he was. I haven't had no -- no contact with none of them people, Danielle. None.

Q    When you were --

A    When I did, that's what -- that's what I mean he was there. So I'm assuming that's what he was from, too. That's where the meeting was held at.

Q    When you were in communication with the group, was there a -- a chapter, a state leader for Michigan?

A    No. We deal with brother Jabari, who's closer to us. If it was, it was some in Detroit,

maybe. Not -- not where I'm at, no.

Q    Did the group have regular meetings?

A    I don't know if they had regular meetings. I just attended one. I don't know how many that they had. I only attended one. Because you had to pay to get in those meetings, and it -- and I -- I couldn't afford all that to get in there. I got a chance to go once. I think, back then, when I went to that one, think it was $75, I think, to attend. so --

Q    Did you have to make a payment to become a member?

A    I think I did, if I'm not mistaken. I'm pretty sure I did. I know we had dues that had to be paid. I think it was a hundred -- hundred-and-something dollars, I think. And that had got overwhelming for me, too. I couldn't afford that. Basically, I had all the information, you know, about who we were and stuff like that already. So then you go online and study.

Q    Were -- how frequently did you have to pay dues?

A    Every month, I believe. It was every month.

Q    You said you had to study. Were there

tests or --

A    You said tests?

Q    Yes.

A    T-E-S-T?

Q    Yeah, tests.

A    No.

Q    (Crosstalk) --

A    Like, take a test? I'm not understanding your question, Danielle. You asked me did I have to take a test?

Q    Yes. Did anyone from the --

A    No.

Q    -- Indigenous Society ever test your knowledge to make sure that you were learning?

A    No. No. Wasn't no test.

Q    So --

MS. ALLEN: Sometime you took a test if you want to be a -- a -- a master. Master is something that can teach you the laws about the -- what courts and stuff can do, what they can't do, or stuff like that. So I didn't never want to be a master. So -- they had to take a test.

Q    Did you receive --

A    Master of something, but I can't remember the word. Huh?

Q    Did you receive emails from the
Indigenous Society once you became a member?

A    I'm pretty sure back then I did. I'm
pretty sure.

Q    Who sent those --

A    And those are email I no longer have
anymore.

Q    Who sent those emails?

A    The person that was in -- in charge of
this area.

Q    And who was --

A    I think. Or I -- I can't remember who got
-- who sent the emails. I know it wasn't Dr. Ali.
Maybe it was the master who was over -- not the one
that -- that -- it wasn't Jabari. It was the master
that was over the area, I believe. And that just if
we have any questions or something like that, I
believe. Like I said, I wasn't in that group long
once I found out what was actually going on,
especially when I got caught up with this situation
we're in right now with the IRS.

Q    You said previously that you joined the
group in 2010?

A    2020 -- I believe 2010. Eleven -- between
'10 and '11, somewhere in there. I want to say '11,

toward the end of '10, 2011. I want to say 2011, I want to say. Basically, because I'm saying that because I remember I had surgery in 2010. So it had to been 2011. Somewhere in there.

Q    And you left the group around 2015 or 2016?

A    I left when I first found out about that check wasn't right. That might -- when that check came up, that's when I noticed. I said, no, I can't -- no, I'm not going to get myself caught up never again with this. Never again.

Q    So you were --

A    But basically -- but basically teaching us who we are, that was cool, to know who I am and where I -- where I came from. That was cool. But when I got caught up when they said we supposed to do 1041s and stuff like that. We don't do 1040s. We do 1041s and stuff -- teaching us that. And when I got caught up with that, Danielle, I discontinued myself with them people.

Q    And so you were a member of the Indigenous Society for about four -- 4 or 5 years?

A    '11, '12, '13, '14, '15 -- four years. I would say four years.

Q    And you were paid dues --

A     I think 2015 was when I found out. Yeah.

Q     And you paid dues every month?

A     Sometime I didn't. I didn't have the money. Sometime I didn't.

Q     Did you have to do anything other than pay dues to --

A     No.

Q     -- remain a member?

A     No.

Q     Did the organization -- the Indigenous Society ever have social events?

A     Far as the meetings? That's all I knew. But anything social, I don't know. If they did, I didn't attend. Basically, we are considered as Moors. I don't know if you familiar with that term or not. Moors is nothing but the -- that don't mean nothing but the melanated in our skin, the darkness of our skin consider a Moor. Black people, people like me, we was considered Moors.

Q     I've heard that term. I have not heard that --

A     That's what they -- that's what I was told it meant. Moor is nothing about the color of your skin.

Q     How did the Indigenous Society recruit

new members?

A    I don't know how they recruit new members. I just heard -- I seen it online. That's when I first came about it, on social media. I don't know if they do it any other than online or not. I'm not sure.

Q    You were never asked to recruit anyone?

A    No. No.

Q    Was there any kind of induction ceremony when you were admitted?

A    No.

Q    Ms. Allen, I'd like to turn your attention back to Government Exhibit 5.

A    Okay.

Q    In that first paragraph, you mention Brother Tai Muhammad.

A    Tai Muhammad. Brother Tai Muhammad. Mm-hmm.

Q    Who is Tai Muhammad?

A    That's the one who did the 1041. I never met him in person. I can't even tell you what he even look like.

Q    How did you communicate with Tai Muhammad?

A    I communicate with him through Sister

Queen Ali.

Q    And who is Sister Queen Ali?

A    She was another member of the group.

Q    Where is she located?

A    I think she stayed in either South Carolina, North Carolina, one of them two -- one of them Carolinas. Want to say North Carolina. It could be South. That's where she was staying at.

Q    How did you communicate with Sister Queen Ali?

A    Well, I met her at -- at the meeting, and, you know, we had exchanged numbers back then.

Q    That's the meeting in Chicago, Illinois?

A    Yes. That's how I met her.

Q    What did she discuss with you when you met her at that meeting?

A    Basically, what I was telling you. What we was taught. We talked about that and who we are and how we've been lied to. And just teaching us, you know, different stuff about who we are and where we come from, and the lies that we were told, and what we, as Moors, stuff that we don't supposed to be doing as though other nationalities are doing that. You know, that we were already here. This is our -- this is our land.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    59

Q    Did -- did she say anything to you about federal taxes?

A    Well, she had her own tax group -- tax business then back -- at that time. And that's why I was told that we don't supposed to do the 1040s. We supposed to do 1041s.

Q    You say she had her own tax business?

A    Business, yeah. She had her own tax business. That's what I was told from her. I never been to it or saw it, but that's what I was told from her.

Q    Did you take that to mean she was preparing taxes for other people?

A    That's what I took it to be. But -- can I minimize this, or you need me to keep it up? Because I can't see you.

Q    You can minimize it for now.

A    Okay.

Q    Did she talk to you about your taxes?

A    About the 1041. She said that's what we supposed to be doing. And everything was mailed to her at that time, and then she send it to Brother Muhammad, I guess, Tai Muhammad. I went through her. I sent everything to her. Like we was told that -- where Golden Assets come in at. Golden

Assets Settlement Trust, we was told that we'll -- that we -- the trust supposed to be put -- everything supposed to be put in trust. That's how you -- your property must be put in trust. That's how the trust came about. Everything had to be put in trust. That's where you put all your property, and everything be owned by the trust. We was told that white people had been doing it for years. That they -- all they stuff is put in trust. And that's how we -- that's how it's supposed to be. Everything must be put in trust. They said we the last ones to know that. That's what we was taught.

Q    Did Sister Queen Ali ask you for any payment or anything else in exchange for --

A    The payment was to got -- the payment's not for her. I guess the payment go to Brother Ali -- I mean Brother Muhammad Ali and Brother Tai Muhammad. It's a lot of them had last names -- had the same last name. But Brother Tai, the payment would've got -- go to him once the 1041 check comes and clears. But I didn't get a chance to pay him because the money got took. The account got froze.

Q    If the account had not been frozen, what would you have paid?

A    The asking price was 50 grand. 50 grand.

And I -- you know, as you can see, I left all -- the money was left in the account because I thought everything was legit. And I was told from another one of the IRS representatives that came in contact with me that they could tell I didn't have a clue, because this has been happening for many times. And, you know, people just don't leave that kind of money sitting in that account. Well, I didn't know. I thought everything was legit. That's why they said they'll take the money and hide it and run with it, and you can't find it. That's I was told by one of the other IRS representatives. That's what they said they knew that I didn't have a clue to leave that money just sitting in that account. I didn't have a clue. I didn't know. So --

Q    Which IRS representative said that?

A    Somebody I spoke to over the phone when they first came after me, sending me letters and stuff. And I told them, I didn't know this wasn't -- why did I get the ticket if it -- I wasn't supposed to get the check. I didn't know. And they said they could tell they knew I didn't know. I can't tell you his name. That was back in 2015 when they -- '14, '15, when they contacted me. He say he could tell I didn't have a clue, I didn't know.

That's why they didn't come after me criminally. And because they -- they know I didn't know, because nobody leaves that kind of money sitting in an account like that. I didn't even know that, that they had problems with that, until it came on me -- back on me. So I didn't have a clue.

Q    What information did you give to Sister Queen Ali so that she could prepare your --

A    Only thing I just gave her was the name of the trust -- the name of the trust and the EIN number to the trust. That was it.

Q    You gave those things to Sister Queen Ali?

A    Yes. Well, I told her over the phone. And I had to tell her -- because we had to get an EIN number for the trust. The trust has an EIN number. And we was told to get the -- the EIN number through the IRS. And I got the EIN number. And that was all that she asked for.

Q    How did you get the EIN number from the IRS?

A    From the IRS. From the IRS.

Q    How did you do that?

A    You can do it over the phone or online. I think I did mines over the phone. I can't remember.

It was either online or over the phone, Danielle. But I think it was over the phone. I can't remember. And we had to get, like, a 98 number. So I guess it's a different number you calls for 98. You know what I mean when I say 98 number?

Q   I don't.

A   It start with 98. That's what -- a 98 number.

Q   Okay. So you called the IRS and you asked for a EIN?

A   Yes. Like you do a -- regular apply for a EIN. I called the IRS number and asked for a EIN. It was called for -- for a trust.

Q   And what -- what -- what did you tell the IRS about the trust?

A   I just ask the question they asked me. I can't remember all they asked me back then. I just answer the question whatever they ask me. And I got the EIN number in the mail.

Q   What was the name of the trust?

A   Golden Assets Settlement Trust.

Q   Did you pick that name?

A   Yes, I picked that name.

Q   Oh. Why did you pick that name in particular?

A    I don't know. Because it -- it sounded cute to me. I don't know no specific reason.

Q    I'll ask you more questions about the trust in a minute, but I want to finish asking you about the Indigenous Society.

A    Okay.

Q    You said you left in 2015, 2016, in that time frame. Are you still in contact --

A    Because I was done when -- when -- when they -- the IRS got in touch with me about that check. I -- I -- I didn't want no -- no -- nothing to do with them after that. So that was, like, what, 2015, I believe they got in touch with me. Either -- '15. In 2015. '15 or '16. One of the two, Danielle, I can't remember. In between those two years. I was done.

Q    And did Sister Queen Ali offer to file your -- your -- a 1041 tax return for you?

A    They had a guy that does that. She didn't do it. Tai Muhammad does it. She didn't do it. Tai Muhammad did the 1041.

Q    How did -- how did he come to file a 1041 for you?

A    I just gave her the name of my trust and my EIN number, and she had the rest of it on her

end with him.

Q    How did you get the idea to have them file your 1040 -- 1041?

A    Because he -- he -- he wanted us the 1041s that she knew. I didn't -- I didn't know anybody that she knew that -- that he does the 1041s.

Q    How did you learn that he does the 1041s?

A    Through Queen.

Q    That's Sister Queen Ali?

A    Yes.

Q    And what did she say about Tai Muhammad?

A    That he does 1041 tax returns.

Q    Did she say anything about why you should let him do your 1041 tax returns?

A    She just said that he does them. That's who does them. That she knew that does them.

Q    Did she say that you can get more money if you do the 1041 tax return?

A    It wasn't about no money, nothing like that, that you can get more money if you do that. Because she didn't make it like it was a scam or nothing like that. I thought it was just what you do, you know, like any other tax preparer. She didn't make it seem like, girl, you can get a whole

lot of money. No, it was none of that. That's who handled -- that's who does the 1041s. He does 1041s for the trust.

Q    But he -- the arrangement was that he would file a 1041 return for you under the name of the trust and the trust EIN that you gave him --

A    Yes.

Q    -- and in exchange you would pay him $50,000?

A    Yes, through her. Everything was through her.

Q    But they didn't say that you would get more money if you did that than if you filed a regular 1040 tax return?

A    No. Well, we was told we wasn't supposed to do 1040s -- 1040. We supposed to do 1041s regardless, anyway. But I always did 1040s all my life, you know, until I -- I joined this group. Because they -- they said earnings and incomes are two different things. And we was taught black people don't supposed to pay taxes on your money that you work for. That's what we was taught in this group.

Q    You were taught that black people aren't supposed --

A     Don't supposed to pay taxes. I know that probably sound crazy to you, but that's what we was taught.

Q     You believe them --

A     That's one of the things I was taught -- huh?

Q     You believed them when they taught that?

A     I did. At that time, I did. Because of, you know, what happened to us in our ancestor days, you know, that, you know, how they owe us or how we was treated. Not me as personal, but our ancestors. I believed them, Danielle, I did.

Q     Are you -- how did you -- let me take a step back. You said you left the International Society. How did you --

A     Yes, I did. Stop associating with them. Nothing else to do with them, period.

Q     Did you communicate to them that you were leaving --

A     No. No.

Q     You just stopped --

A     Queen and I -- prior to me getting the 1041, Queen and I had got into it. I forgot what we got into it about at that time. But no, I didn't tell anybody. I just disassociated myself with

everybody and stopped dealing with them when I got caught up with the checks -- check thing, that check I got from the IRS.

THE REPORTER: Ms. Allen, if you could just wait for her to finish her questions. Just for the record.

THE WITNESS: Oh, okay. Okay. I'm sorry. I apologize.

THE REPORTER: Thank you very much.

Q    You said you got into it with -- was that Sister Queen Ali?

A    Me and Sister Queen Ali got into it. Yeah, we did. So we had fell out after the 1041 was already -- the stuff was given to her.

Q    Why did you have that falling out?

A    I can't remember what happened. She did something dirty -- she did something dirty I didn't like. Because I know the guy I was dating at that time, I noticed when I'm not around they on the phone talking and stuff like that behind my back. So I didn't know, it was something going on between them. So I -- I -- me and her head fell out. But I was still in the group. It was after I had gave her the information for the trust. Because one day she called him, and she thought I was at work, and I

wasn't at work. And I wondered why was she calling him?

Q    Was the person that you were dating in Michigan?

A    He lived in Indiana, but he wound up coming to Michigan. But he lived in Indiana. He wound up coming to Michigan. But we all met Queen at that meeting we went to in Chicago. He didn't know Queen, either. We met her at that meeting.

Q    So you went with him to the meeting?

A    Yes.

Q    Do -- do you still follow the Indigenous Society on social media?

A    No.

Q    Did you ever talk about the trouble with the IRS with Sister Queen Ali?

A    No.

Q    Did you ever talk about the trouble with the IRS with Brother Tai Muhammad?

A    No.

Q    Even though he prepared the 1041 for you?

A    No.

Q    Did Brother Tai Muhammad have any qualifications to prepare tax returns?

A    I have no idea. I'm assuming he did. He -

- he knew how to do them. So I'm assuming he did because he knew how to do them.

Q    Was he an accountant?

A    I don't know.

Q    So you got the EIN and the name of the trust, and you gave that to Sister Queen Ali. And then she --

A    Correct.

Q    -- that to Brother Tai Muhammad, and he filed the Form 1041?

A    Correct. To my knowledge, he -- he filed the 1041, based on -- you know, Queen gave -- she gave everything to him. I didn't see her personally give anything to him because I'm not there, but that's who she gave it to, and that's supposed to be the 1041. That's all I asked, Danielle. What does it say -- I looked at the thing you sent me. What does it say on the 1041? I never seen it. And when I talked to the revenue officer, he said you guys didn't -- didn't even have it, that they didn't have it. He was asking me. I didn't know. He said you guys didn't have it. Then you sent it to me. That was my first time seeing it.

Q    But you knew that Brother Tai Muhammad was going to be filing it on your behalf?

Transcript of Linda Allen-Bey
Conducted on February 11, 2026          71

A     Yes. I was aware of that.

Q     Okay. Ms. Allen, I'd like to ask you some questions now about the trust, specifically. What is Golden Assets Settlement Trust?

A     It's a name that I thought -- I thought of that I wanted to name my trust. That's it.

Q     When was it created?

A     In 2013.

Q     Who created it?

A     This guy that I met, he -- he did -- he did the trust for me.

Q     And what was his --

A     And I don't know -- I don't know where he -- I couldn't remember where he live at. I couldn't remember where he -- what state he lived in. But he the one create the trust. He the one did the -- the document for me.

Q     What was his name?

A     I can't remember his name. It was one of those national names.

Q     How did you meet him?

A     Through Queen. Queen was telling me about he do trust.

Q     Did you meet him in person?

A     No.

Q    And how did he help you to create the trust?

A    I just gave him the name of the trust, and that's what I guess he did. He do trust for people. Yeah, that's what he done. And that's how --

Q    Did he give you any documents back?

A    My Golden -- I had got Golden Assets Settlement Trust. That document I had got. I know I -- I filed it with the County, but I have to go over there and get a copy of it. I remember filing it with the County.

Q    You filed it with the County?

A    Yes, I did.

Q    Do you remember what kind of document that was?

A    It's just a trust document. Trust -- stating the name of the trust and stuff like that, and different information about the trust.

Q    Yeah, Ms. Allen, I'd ask that you try and get a copy of that from the County and then produce it to the United States. And I can --

A    Okay.

Q    -- follow up with you in writing after the deposition as well --

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    73

A     Okay.

Q     -- about that document. Thank you.

So you gave him the name of the trust. And this person that you met through the Indigenous Society, you never met him in person?

A     No.

Q     Did you email him? Is that how you communicated with him?

A     Everything went through Queen.

Q     So you sent Queen the information about the trust and then she had this other person create the trust?

A     Correct.

Q     And is it Sister Queen Ali who sent you the trust document that you filed with the County?

A     He sent it to me once he got done with it, the one I filed with the County. But she the one got me in touch with the guy that does trust.

Q     How did he send it to you?

A     In the mail.

Q     What was the return address on the envelope?

A     Danielle, I don't know a return address. I don't even remember his name. And that's the God honest truth.

Q    Did anyone -- strike that. What is your understanding of what a trust is?

A    My understanding what a trust is, is what we -- that keeps our properties and stuff that we own in a trust. That's my definition of a trust. Everything must be kept in trust. Maybe I didn't get the full understanding and disclosure what it really means, but that was my understanding what a trust is. That's where you put and keep all your property and stuff at, in a trust. Now, we was taught our children were our property. We was taught all of that.

Q    Did anyone explain to you the structure of a trust?

A    No.

Q    Did anyone tell you about different kinds of trusts?

A    Irrevocable trust. Revocable trust. Stuff like that that I know. That's the only thing I know. Irrevocable is -- I was taught that what's in the trust, it can't be changed because it's irrevocable. Only thing can be changed is revocable. Mines was an irrevocable trust.

Q    And who taught you that?

A    It's in a trust. It states that all of

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    75

this stuff stays in the trust.

Q    And who taught you --

A    Just going online and -- and listen to stuff like that. Some stuff, if I had a question, I'd go online and see what I didn't understand. Listen to different people talk online. You know, you go on YouTube and listen to the videos on YouTube.

Q    Ms. Allen, I'd like to remind you, if you could let me finish my questions, that would be --

A    Oh, I'm -- I'm sorry, Danielle. I'm so sorry. It's a habit. I'm sorry. It's a habit. Non-intentional.

Q    No worries.

MS. SUMNER: Sorry. I lost my train of thought. Could you read back the -- the last question, Erik?

THE REPORTER: One moment. Revocable trust, stuff like that that I know of. That's the only thing I know. Irrevocable is -- I was taught that's what's in the trust. It can't be changed because it's irrevocable. I don't think can change. It's irrevocable. And who taught you that? was the last question.

MS. SUMNER: Thank you.

Q    Ms. Allen, who taught you that trusts could be revocable or irrevocable?

A    I got that offline on the videos. The trust was created as irrevocable. And to know difference between what's a irrevocable trust, I went on YouTube.

Q    So you didn't learn about that --

A    To get the --

Q    -- difference from the Indigenous -- anyone in the Indigenous Society?

A    No.

Q    Did anyone from the Indigenous Society tell you about trust beneficiaries?

A    Well, I learned from the guy that did the trust, far as my beneficiary, it had to have beneficiaries and stuff like that. And then when I learned online have to have beneficiaries.

Q    Did anyone from the Indigenous Society advise you on how to operate the trust once it was created?

A    I learned some -- well, stuff Queen was telling me. And then when I go online and see how you operate a trust.

Q    What did Sister Queen Ali tell you about how to operate the trust?

A    Just that everything's supposed to be kept in trust, and we don't -- you know, how -- like I said before, that you don't own nothing. Everything is owned by the trust. And once I went online and studied, they basically saying the same thing.

Q    Ms. Allen, I'd like to turn to -- this is Government Exhibit 2.

A    Okay.

Q    And on page 2 of your answer to the complaint -- it's kind of close to the middle of that paragraph -- there's a sentence: However, I did ask how our trusts entitled to receive such a tax refund, and I was told that there is a special fund account set aside on our behalf from the government.

A    Okay.

Q    Who told you that there's a special fund account set aside by the government?

A    Queen first told us about it, and we learned about it in -- and I learned about it in that meeting that we went to. With the birth certificate and the Social Security number.

Q    Who told you that trusts were entitled to receive tax refunds?

A    I got that from Queen. She attended more meetings than I did. So she had more knowledge than I did.

Q    Did she say that if you file with a trust, you'll receive a tax refund?

A    I'm assuming you -- I assume you file -- you receive a refund when you file a tax return.

Q    What was the special fund account that you were told about?

A    The birth certificate?

Q    The special fund account that was set aside on our behalf from the government. That statement in your answer.

A    From the birth certificate.

Q    What birth certificate?

A    My birth certificate. They say it was two. The Social Security card and the birth certificate, those was the two funds that was set aside.

Q    So you believe there's -- could you clarify the -- how the special fund account is related to your Social Security number and your birth certificate?

A    I don't -- I didn't really understand how was it. It was what we was told. They say if you

look at the birth certificate, you can see it's on

check paper, and the numbers. All that means

something.

Q    And that entitles you to a -- money set

aside in a special fund?

A    That's set aside for me as when I was

born, yes.

Q    By filing a 1041 return on behalf of a

trust --

A    That's where the money come from they

say. They -- they didn't say by filing. I was told

that's -- they -- we have money already set aside

for that, and that's where they get the money from,

off my birth certificate.

Q    Ms. Allen, please allow me to -- to

finish the question.

A    Oh, I thought you was done. I thought you

was done. I'm sorry.

Q    So by filing a -- a 1041 account, you

believed that that would entitle you to get a

payment from this special fund account that's

associated with your birth certificate and Social

Security number?

A    At that time, yes, I believed that.

Q    Did the Sister -- Queen Sister Ali or

anyone else from the Indigenous Society ever cite any laws or statutes or regulations to substantiate these lessons?

A     No, not to me.

Q     Did you do any research on your own into the special fund account that Queen Sister Ali told you about?

A     Yes. With the birth certificate, I went online.

Q     What did you find online?

A     That we -- that the money is -- is -- come from our birth certificate. That it's funds on the birth certificate.

Q     Did you ever talk to anyone other than Queen Sister Ali about the special fund account?

A     Not no one that was in the group.

Q     Did you talk to anyone outside the group about it?

A     They wouldn't understand because you had to be in the group to understand it, or be online, or know to understand what we was taught. No.

Q     Ms. Allen, I'd like to direct your attention back to the second page of your answer. Towards the bottom of that paragraph, you stated, I have no idea that this was a scam/scheme until I

was contacted via a revenue officer.

        A     Okay.

        Q     When were you contacted by the revenue officer?

        A     I believe it was 2016. Beginning of 2016 or '15, somewhere in there. '15 -- 2015 or '16. One of those two.

        Q     And what did the revenue officer tell you?

        A     That I wasn't entitled to the money. That a fake tax return was -- was filed on the trust.

        Q     Do you agree that the -- the return that was filed on behalf of the trust was fake?

        A     I didn't understand it at first, but I'm assuming that it was fake. That's why -- they would've never came after me if it wasn't.

        Q     Did the member of the indigenous group who created the trust for you -- I think his name was Tai Muhammad -- did he ever give you any kind of trust agreement or instrument or other document for the trust?

        A     Tai Muhammad didn't create the trust. He the one did the 1041. I can't remember the young man name who done the trust for me. He just gave me the trust document that I filed with the county

building.

Q    Okay. I may have previously asked you this, but why did you create Golden Assets Settlement Trust?

A    Why I came up with the name, or why did I create it?

Q    Why did you create it?

A    Because we was -- I was told, we was told in the group, that we -- trust supposed to own property. Trust supposed to own property, not the living person, was me.

Q    What is your role in the trust?

A    The guy that created the trust, he -- he had, he made -- had me the trustee, the trustor, the beneficiary and all that. And I was told that it wasn't set up right. That's why the IRS came after me, say it's an alter ego trust. That was my role. I'm assuming that's what it's supposed to been because I believed in what he did in his work. But he had me as all those different people.

Q    Aside from the refund that was issued to the trust for tax year 2013, did the trust ever receive any other income?

A    No.

Q    Did you ever pay tax withholdings on

behalf of the trust?

A    No.

Q    Did anyone else ever pay tax withholdings on behalf of the trust?

A    No.

Q    Did the trust have income during the calendar year 2013?

A    What do you mean by income?

Q    Did it earn any money?

A    I'm not understanding what you mean by earn any money. Did it earn -- I'm not understanding what you mean.

Q    Were there any payments made to Golden Assets Settlement Trust in 2013, other than the refund --

A    No.

Q    -- that was issued by the IRS?

A    No, not -- no, nothing other than a refund.

Q    Did the trust ever have any expenses?

A    What do you mean by expenses?

Q    Did the trust -- did anyone on behalf of the trust make any purchases?

A    Purchases like what?

Q    Services. Food. Property. Real property.

A     What -- the house was put into the trust. The vehicles that I had was put into the trust. That's what you mean? You said food?

Q     Sure.

A     No food.

Q     Okay. Is -- is the trust still active?

A     No.

Q     Have you filed any tax returns on behalf of the trust since you filed the 2013 return?

A     No.

Q     Has anyone else filed any tax returns on behalf of the trust since the 2013 return?

A     No. Not to my knowledge, no.

Q     So you mentioned the house. That's the -- the house at 1619 Lyola Court is in the name of the trust?

A     Correct.

Q     And you mentioned two cars were put in the name of the trust as well?

A     Correct.

Q     Were there any other assets that were put under the name of the trust?

A     No. Not to my knowledge, no.

Q     Is there -- strike that. I know you said previously, Ms. Allen, that you're the -- the

grantor, the trustee, and the beneficiary. Is there anyone else who's affiliated with Golden Assets Settlement Trust in any way?

A    No, not to my knowledge. He just had me list my sons' names, you know, on the -- he had put my sons' names on there. But no, no one else. They wasn't even affiliated with it.

Q    You said the -- the person who drafted the trust documents put your sons' names on the document?

A    Yes.

Q    What --

A    That's considered my -- that's considered my property.

Q    You listed your -- your children as property of the trust?

A    It was my property. It was listed as my property. They was just put in trust because they was considered my property.

Q    Could you clarify what's considered your property?

A    My children. That's what we was told in that group.

Q    So they're not listed as beneficiaries of the trust?

A    I think he had them down as assets --
accessory beneficiary, I believe he had them down
as. I have to go get a copy of it and look at it.

Q    Is that the copy -- the document that you
referred to was filed with the County?

A    Correct.

Q    So aside from your sons and yourself,
there's no one else associated with Golden Assets
Settlement Trust?

A    No.

Q    I'm going to drop another document in the
chat. This is Government Exhibit 7. Please let me
know once you've had a chance to look at the
document.

(Exhibit 7 was marked.)

A    I got it.

Q    Ms. Allen, do you recognize this
document?

A    It's the warranty deed, isn't it? Yeah,
it's a warranty deed.

Q    It's a deed for the house that you're --
you're living at?

A    Yes.

Q    Who filed this deed with the County?

A    Had to been me. Or it was filed during

the closing, probably. It was filed during the closing.

Q    (Crosstalk) --

A    I think they filed it, Danielle, and I just wanted, like, a copy of it. Can't remember.

Q    The -- the deed states under the -- the section, Warranty Deed, it states that the property was conveyed from Andrew Cleminshaw to Golden Assets Settlement Trust, and it's signed by a notary on December 15, 2014, and then registered on January 9th, 2015. Ms. Allen, who is Andrew Cleminshaw?

A    That was the guy who owned the house.

Q    Did you ever talk to Andrew Cleminshaw?

A    Only at the closing. We didn't -- we didn't talk, though. He was just there at the closing.

Q    Did you decide to buy this property?

A    Are you done? I'm sorry. That's just the --

Q    Yes.

A    -- question you asked. Yes.

Q    And why did you decide to buy this property?

A    I liked the house.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    88

Q    How did you pay for the property?

A    It was -- it was paid with a cashier's check.

Q    What funds did you use to pay for this property?

A    The one I received from the 1041.

Q    Did you ever visit the property at 1619 Lyola Court before you moved in?

A    Just when I looked at the house.

Q    When did you look at the house?

A    Prior to buying it? In 2014. Can't remember what month. That was so long ago.

Q    So why did you put the house in the name of Golden Assets Settlement Trust?

A    Again, because we was told the trust own everything and whatever we buy be in the name of the trust. That's what I was taught. That's why.

Q    Has anyone other than you ever lived at this property since you purchased it in 2014?

A    My son lived here -- two of my sons lived here. Guy I used to date, he lived here. And that was it.

Q    How long did your sons live there?

A    I can't remember how long they were here -- one was here. I can't remember.

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                89

Q    Was it a couple of years?

A    Yes. I'm pretty -- pretty sure. Yes.

THE REPORTER: Counsel, we've been going about two hours. If we could take a short break.

MS. SUMNER: Sure. Would you like ten minutes?

THE REPORTER: Ten minutes would be great. Thank you.

MS. SUMNER: Ms. Allen, let's take a ten-minute break and come back at 1:10 p.m.

THE WITNESS: Okay.

(Off the record.)

THE REPORTER: We are back on the record.

BY MS. SUMNER:

Q    Ms. Allen, I would like to ask you some questions about your -- the current financial and medical situation. I know you've discussed this previously over the phone a bit. You stated earlier in this conversation that you are no longer employed. Do you consider yourself to be retired?

A    I won't say retired because I'm not -- I'm not old enough to retire. Just not able to work now.

Q    Would you consider yourself to be between jobs right now?

A       No, not right now.

Q       Are you currently looking for a job?

A       Right now, I'm disabled.

Q       And -- and your disability prevents you from being able to work?

A       Correct.

Q       Are you receiving Social Security disability income?

A       Correct.

Q       Do you have any documentation from the Social Security Administration about your eligibility for Social Security disability income benefits?

A       I have my -- my -- my beneficiary letter.

Q       Would you be able to produce that to the United States? And I can -- I can follow up in writing about that request later as well.

A       I can send you a copy of it.

Q       Ms. Allen, I -- am I correct that you had some kind of medical procedure in -- in December?

A       I did.

Q       I -- I hope it went well. Is that related to the medical reasons that you're currently on disability, or is that another separate medical issue?

A    I choose not to answer that because that's my personal business. But I choose not to answer that because it has nothing to do with what's going on here. That's personal. I'm sorry.

Q    I understand. I previously sent you a form -- Form 433A, and I understand that you filled it out and mailed it back to the P.O. Box 55 address. Is that correct?

A    Correct. You haven't received it yet?

Q    I don't believe I have. I've been keeping my eye out. So I will notify you if -- when I resend it or if I haven't received it in a few more days, I might have to ask you to resend it to make sure that I receive it.

A    Have you checked the P.O. Box, or you don't be the one to check the P.O. Box?

Q    I -- I can't check it personally. So I'm --

A    Oh.

Q    -- just waiting for it to work its way over to me.

A    Okay. Well, I was told from the post office it's supposed to reach your destination at -- on Monday. But you say it probably don't mean you'll get it on Monday. I didn't know that. So

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                          92

maybe it's there today. Hopefully.

Q    Yeah. Did you fill out the Form 433A truthfully and completely?

A    You finished?

Q    Yeah.

A    Yes. To my ability, yes, I did.

Q    Ms. Allen, I'd like to take a step back to when the IRS first contacted you about the fraudulent return. When did the IRS first reach out to you?

A    It was in 2015 or '16, between those two. I want to say '15, though. But I could be wrong. Don't quote me on that.

Q    And what did the IRS say to you?

A    I received a letter first in the mail and saying that I wasn't the -- the trust wasn't entitled to the money. And then the revenue officer shortly, not too long behind that, contacted me.

Q    And the --

A    And then they closed the -- I'm sorry. They froze the accounts -- the bank account. And then I started receiving letters and contact through the revenue officer.

Q    And the IRS took -- took back the money that was still in the bank account?

A    Correct.

Q    Did the IRS try to collect the assets that were in the name of the trust?

A    They did get the two vehicles and garnish -- wage garnishments.

Q    Ms. Allen, have you been involved in any litigation other than this case?

A    With Janet T. Neff back in 2016.

Q    I'm sorry, I didn't hear you properly. What -- what case was that?

A    With Janet T. Neff in 2016.

Q    And what was that case about?

A    About the -- about getting that refund. The revenue officer opened up a case.

Q    Oh, okay. Was that the -- a summons enforcement petition?

A    I can't remember. It was something.

Q    Would seeing the complaint refresh your recollection?

A    From the revenue officer?

Q    Yes.

A    I have to look at it. Oh, you fixing to pull it up?

Q    Okay. Ms. Allen, I just uploaded Government Exhibit 8 to the chat. Take as much time

as you would like to review that document.

(Exhibit 8 was marked.)

A    I guess this is the first one. I can't remember -- recall because it's been so long ago. But I guess this was the first complaint. I'm not for sure. Because I see it said August 2015, I can't remember what was back in August 2015. I'm looking at the date here. But I don't know if this was the first one or not. I remember it was cold outside when I went in front of Janet T. Neff. It wasn't in the summer. So --

Q    Was Janet T. Neff the -- the judge presiding in this case?

A    Correct.

Q    Do you recall what happened in this case?

A    Far as what? What do you mean by what happened?

Q    How the case was resolved.

A    I can't remember.

Q    Ms. Allen, have you ever brought suit against anyone?

A    What do you mean?

Q    Have you ever filed a lawsuit against anyone?

A    I filed a lawsuit when Brian -- Michael

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                    95

Bryant came after me behind -- with this because I didn't understand it. I think I did. Because I didn't know what was going on when he first contacted me. I had no idea of nothing what was going on. But that didn't -- nothing came about it.

Q    Ms. Allen, I'm sending you a Government Exhibit 10.

(Exhibit 10 was marked.)

A    Okay.

Q    Do you recognize this document?

A    Who filed this? Me? Who filed this? I did or --

Q    If you turn to the ninth page of the document. This page starts with the heading Jurat, and it -- do -- do you see the page I'm referring to?

A    I see it.

Q    And in the middle of the page, there's a signature line. Is that your signature?

A    I signed it. I signed it. That's a copy of my signature. Signed before a notary. This is signed before a notary.

Q    This is a complaint that you brought on behalf of Golden Assets Settlement Trust?

A    This so long ago, I -- I don't remember

half of this stuff. That's why I asked did I file this or what. I can't remember.

Q    Did you write this complaint?

A    Did I do what?

Q    Did you write this complaint?

A    I don't remember. I'm looking at it, but I don't remember. I don't remember. This is back in 2000, what, '15? I don't remember. I see that -- I see a copy of my signature signed in front of the notary. But I remember I did a complaint against the IRS because I didn't have no idea what was going on, which I told you that.

Q    Did anyone help you to write this complaint?

A    Back at that time, I'm pretty sure not because I was pretty spiffy in doing complaints. I'm pretty sure if I brought it, I did a lot of research and study.

Q    So you wrote this complaint on your own?

A    Pretty sure I did. I was more spiffy than what I am now, you know, doing my research online to help me out, you know, with my issue that I had. Like I said, I don't even remember this. This was so long ago, 2015. That was over ten -- over a decade ago. I don't remember.

Q    Do you remember filing this complaint?

A    I remember filing a complaint.

Q    Do you remember what happened in this case?

A    No, I don't. I can't even remember filing this, but I see my signature is on here. I can't remember.

Q    Ms. Allen, have you ever filed for bankruptcy?

A    I filed for bankruptcy a few times in my life.

Q    I have one more question for you about Government Exhibit 10. Why did you file this complaint?

A    Because I didn't like how the revenue officer came after me. He didn't give me a chance to explain anything before he start doing -- taking action against me. Because I didn't have a clue that the return was -- was fraudulent. And they didn't give me a chance to even try to let them know that I had no idea what was going on, to discuss what happened or nothing. They just attacked me and charged me -- attack me and accuse me, not charge me, accusing me of doing fraudulent returns and doing this and doing that without

getting my side of the story. The way he came at me and the way he was talking to me.

Q    Turning back to the -- the bankruptcy. How many times have you filed for bankruptcy.

A    In my life?

Q    Yes.

A    Three, to my -- I think -- I believe three.

Q    Have you filed for bankruptcy since 2013?

A    Yes, I have.

Q    When was that?

A    It got dismissed.

Q    When did you --

A    Couple years ago. It got dismissed.

Q    Okay. Ms. Allen, I'm putting Government Exhibit 9 in the chat. Once you open it and have a minute to -- to look at it, can you --

(Exhibit 9 was marked.)

Q    Do -- do you recognize this document?

A    Yes, I recognize this document. What year was this?

Q    The -- the first page of the document is stamped Filed on June 9, 2016, in the top right there.

A    Okay. (Indiscernible) documents -- but I

Transcript of Linda Allen-Bey
Conducted on February 11, 2026                99

can't remember what happened with it -- with this.

Q     Is this the bankruptcy case that you referred to that got dismissed?

A     Okay.

Q     Why did you file for bankruptcy in June 2016?

A     Because I was bankrupt.

Q     Why were you --

A     And my -- my wage was getting garnished. I was bankrupt. I didn't have a clue what was going on. They just came after me and didn't give me a chance to explain anything. And I couldn't afford it. I couldn't even afford -- they was taking all my money that I worked for. Only leave me with $198. I was bankrupt.

Q     Ms. Allen, have you ever filed any administrative claims with the IRS?

A     What's that?

Q     Like, a appeal of any IRS actions.

A     I have.

Q     Can you tell me what happened?

A     I think it was the time -- time had -- I can't remember. I think it -- it was with the time -- I think the timing of it, I believe. I can't remember.

MS. SUMNER: Thank you, Ms. Allen. I have asked all the questions that I had for you today, so I will go ahead and conclude the deposition. I would like to thank you for your time and reiterate that you'll get a copy of the transcript to review.

THE REPORTER: And before we go formally off the record, could I get -- Ms. Sumner, are you going to order the transcript today?

MS. SUMNER: Yes, please. Just a regular transcript.

THE REPORTER: Standard delivery?

MS. SUMNER: Yes, please.

THE REPORTER: And, Ms. Allen, since you do not have counsel representing you today, you also have the opportunity to order the transcript. You can also order it later if you want.

MS. ALLEN: Do I have to pay for that, Erik?

THE REPORTER: If you're ordering it, you will have to pay for it. But you will get the errata sheet version to -- to check over for mistakes. That is not something you pay for.

MS. ALLEN: Okay. Because I don't have no money to pay for no transcript, sweetheart.

THE REPORTER: All right. That's fine.

Thank you very much. Oh, and did you want the exhibits attached, Miss Sumner?

MS. SUMNER: Yes.

THE REPORTER: All right.

MS. SUMNER: All the exhibits there, I can send them if you need anything.

(Off the record at 12:33 p.m.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Erik Larson, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

*Erik Larson*

_____

ERIK LARSON, NOTARY PUBLIC,

FOR THE STATE OF MINNESOTA

February 18, 2026

CERTIFICATE OF TRANSCRIBER

I, Marti Schreiber, do hereby certify That this transcript was prepared from the digital Audio recording of the foregoing proceeding; that Said proceedings were reduced to typewriting under My supervision; that said transcript is a true and Accurate record of the proceedings to the best of My knowledge, skills, and ability; and that I am Neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

_Marti Schreiber_

_____

MARTI SCHREIBER

PLANET DEPOS, LLC

February 18, 2026